11-8318-JMH

UNITED STATES DISTRICT COURT *SEALED*
DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 11-cr-10279 |
| v. | 18 U.S.C. § 371 (Conspiracy) |
| | 18 U.S.C. §§1343, 2 (Wire Fraud) |
| (1) CHRISTOPHER S. GODFREY, | 18 U.S.C. §§1341, 2 (Mail Fraud) |
| (2) DENNIS FISCHER, | 18 U.S.C. §§1017, 2 (Misuse of Government Seal) |
| (3) VERNELL BURRIS, JR. and | 18 U.S.C. § 982 (Criminal Forfeiture) |
| (4) BRIAN M. KELLY, | |
| Defendants | |

FILED by _____ D.C.

AUG 09 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**INDICTMENT**

The Grand Jury charges:

**INTRODUCTION**

At all times relevant to the charges in this indictment:

1.    CHRISTOPHER S. GODFREY lived in Delray Beach, Florida. DENNIS FISCHER lived in Highland Beach, Florida.

2.    GODFREY was the president and FISCHER was the vice president and treasurer of a Florida company called Home Owners Protection Economics, Inc. – which also operated under the names Deleverage America, Inc., DC Financial Group, Xpress Funding, Inc., and Debt2Prosperity – and a successor company called Circle of Financial Safety (all collectively referred to as "HOPE").

3.    VERNELL BURRIS, JR. lived in Boynton Beach, Florida. He was the manager, and primary trainer, of the HOPE telemarketers.

4.    BRIAN M. KELLY lived in Boca Raton, Florida. He was one of the principal telemarketers for, and a trainer of telemarketers for HOPE.

5.    From approximately January 2009 through May 2011, GODFREY, FISCHER,

BURRIS, and KELLY (collectively, "the defendants") made, and instructed their employees to make, a series of misrepresentations to induce financially distressed homeowners looking for a federally-funded home loan modification to pay HOPE a $400-$900 up-front fee in exchange for HOPE's home loan modifications, modification services, and "software licenses." Among these misrepresentations were the claims that HOPE would provide essential assistance that the homeowner needed to obtain a home loan modification and that, with HOPE's assistance, the homeowner was virtually guaranteed to receive the modification. Through these and other misrepresentations, HOPE was able to persuade thousands of homeowners to pay more than $3 million in fees to HOPE.

6.      In exchange for these up-front fees, HOPE sent its customers only a do-it-yourself application package, which was virtually identical to the application that the government provides free of charge, and instructed the customers to fill out the application and submit it to their mortgage lender. As the defendants knew, the HOPE customers who did use these forms to apply on their own for loan modifications had no advantage in the application process, and, in fact, most of their applications were denied.

## BACKGROUND ON FEDERAL MORTGAGE ASSISTANCE PROGRAMS

7.      The Home Affordable Modification Program ("HAMP") is part of the Troubled Asset Relief Program ("TARP") and is a federally-funded mortgage assistance program designed to reduce homeowners' mortgage payments, either by lowering their interest rates or extending the repayment period for the loan. HAMP offers federal payments to more than 100 mortgage lenders (typically banks and other mortgage companies) if they successfully modify loans for qualifying homeowners.

8.      There is no charge to apply for HAMP. Homeowners can apply for the program by directly contacting their existing mortgage lender or by calling the "Homeowners' HOPE Hotline"

(1-888-995-HOPE) to speak to a government-approved housing counselor, who will provide assistance free of charge. The application bears the seal of the United States Department of the Treasury, in close proximity to the "1-888-995-HOPE" "Homeowners' HOPE Hotline" number. Homeowners can obtain this form online, free of charge, and submit it directly to their mortgage lender.

     9.     The "HOPE" acronym is used widely throughout the government-sponsored HAMP programs. "Homeowners HOPE," and variations of the HOPE hotline, including "Homeowner's HOPE Hotline" and "888-995-HOPE," are trademarked by the Homeownership Preservation Foundation, an independent national nonprofit.

3

## COUNT ONE
### (Conspiracy)
### 18 U.S.C. §371

10.     The Grand Jury realleges and incorporates by reference paragraphs 1-9 of this

Indictment and further charges that:

From approximately January 2009 through May 2011, in the District of Massachusetts and

elsewhere, the defendants,

(1) CHRISTOPHER S. GODFREY,
(2) DENNIS FISCHER,
(3) VERNELL BURRIS, JR., and
(4) BRIAN M. KELLY

and others known and unknown to the grand jury, did knowingly conspire to commit the following

crimes:

a.     Wire Fraud (18 U.S.C. §1343) – having devised, and intending to devise, a

scheme to defraud and to obtain money and property by means of material

false and fraudulent pretenses, representations, and promises, to transmit and

cause to be transmitted in interstate and foreign commerce, wire

communications, including writings, signals, and sounds, for the purpose of

executing the scheme;

b.     Mail Fraud (18 U.S.C. §1341) – having devised, and intending to devise, a

scheme to defraud and to obtain money and property by means of material

false and fraudulent pretenses, representations, and promises, to cause items

to be delivered by U.S. mail and by private or commercial interstate carrier,

for the purpose of executing the scheme; and

c.     Misuse of Government Seal (18 U.S.C. §1017) – to fraudulently and

4

wrongfully affix and impress the seal of a department and agency of the United States, specifically, the Department of the Treasury, to and upon a document, specifically, the HAMP application form, and with knowledge of its fraudulent character, and with wrongful and fraudulent intent, to use and transfer to another such document, to which and upon which said seal had been so fraudulently affixed and impressed.

### MANNER AND MEANS OF THE CONSPIRACY

**Setting Up HOPE**

11.    In or about 2009, GODFREY and FISCHER set up, and, from then on, controlled multiple bank accounts for the purpose of receiving and re-distributing the up-front fees that homeowners paid to HOPE. They were both signatories on these accounts.

12.    In or about 2009, HOPE applied with the IRS for federal non-profit status. The IRS rejected this application, however, after concluding that HOPE was a commercial, not charitable, enterprise.

13.    HOPE also submitted an application to the State of Florida for non-profit status. After a Florida official pointed out that the company's articles of incorporation listed its purpose as "Sale of Software Product," GODFREY amended the articles to list the company's purpose as "Provide Consumers Education for purpose of managing personal debt." Florida ultimately granted HOPE non-profit status.

14.    GODFREY and FISCHER rented office space for HOPE in Delray Beach, Florida. There, they employed dozens of telemarketers, including BURRIS and KELLY, to sell HOPE's purported home loan modifications, modification services, and "software licenses" to homeowners around the country, including those in Massachusetts.

15.     BURRIS hired and trained HOPE's telemarketers, created and distributed telemarketing sales scripts to the telemarketers, and approved and edited scripts that telemarketers presented to him. KELLY, an experienced and high earning telemarketer known as a "closer," also trained other telemarketers and assisted them in creating telemarketing scripts.

16.     GODFREY and FISCHER also employed several "Customer Care Representatives," or "Processors," to communicate with, and respond to complaints from, customers who had already paid HOPE the up-front fees. They also employed individuals, including L.S., who were responsible for trying to prevent homeowners from successfully reversing the charges to HOPE on their credit or debit cards ("charge-backs").

17.     GODFREY and FISCHER purchased, or otherwise acquired, tens of thousands of mortgage "leads" from various sources.  This "lead" information generally included the homeowner's name, residential address, telephone number, mortgage lender, original loan amount, and whether the homeowner was behind on his or her mortgage payments.

18.     The defendants, and others at HOPE, then solicited these leads and other distressed homeowners through a variety of means, including direct mail, e-mail, and telemarketing phone calls.

**HOPE's Misrepresentations**

19.     In soliciting homeowners, the defendants, and other HOPE employees acting at their direction, made a series of misrepresentations, including the following: (1) HOPE was affiliated with the homeowner's mortgage lender; (2) the homeowner had been approved for a home loan modification; (3) the homeowner would receive a specified reduction, or specified range of reduction, in his or her monthly mortgage payment amount or interest rate; (4) HOPE had an almost perfect record of obtaining home loan modifications; (5) HOPE was able to greatly increase the

homeowners' chance of obtaining a loan modification, in part because of its connections with mortgage lenders; (6) homeowners could stop making mortgage payments while they waited for HOPE to arrange for their loan modification; (7) HOPE operated as a non-profit entity; and (8) HOPE would refund the customer's fee if the modification was not successful.

20.     The defendants and other HOPE telemarketers used these misrepresentations to persuade thousands of homeowners to pay HOPE, either with a credit or debit card or a bank transfer, an up-front fee ranging from $400 to $900 (the amount varied depending on HOPE's assessment of how much the customer could pay), for a total of more than $3 million.

*Hope Was Affiliated With Homeowner's Mortgage Lender*

21.     In HOPE's direct mail and e-mail solicitations, it intentionally misled homeowners to believe that it was connected with their mortgage lender. These solicitations generally included the homeowner's full name, the name of the homeowner's mortgage lender, and the original loan amount.

22.     One sample e-mail solicitation was titled "Home Loan Modification With [MORTGAGE LENDER]" and stated:

Hello [NAME],

I have your application for your loan modification with [LENDER], through the Home Affordable Modification Program. We have on record that your [sic] 1 months [sic] behind. Please call me as soon as possible so we can finish your application and move forward . . . . under H.A.M.P. guidelines interest rates are between 2%-4.25% and the program will bring you current on the mortgage. Also, your mortgage payment maybe [sic] eligible to be reduce [sic] by up to 50%.

23.     HOPE's mailers purported to be from the "Re-Negotiation Department" at the homeowner's lender. They directed homeowners to call a HOPE phone number, stating "if you are

7

in danger of losing your home or are facing a financial hardship, CALL IMMEDIATELY." Callers were then connected to one of HOPE's telemarkers.

24.     The defendants intentionally mislead homeowners into thinking that they were contacting their mortgage lender, and they did so in an effort to increase the number of homeowners who responded to HOPE's solicitations.

### Homeowners Approved for Loan Modification

25.     When HOPE telemarketers spoke to homeowners, they generally requested information from the homeowners about their home, their loan, and their financial situation. They then asked the homeowner to hold on the line while an "underwriter" reviewed the information. After several minutes, the telemarketer got back on the line and told the homeowner that he or she had been "qualified," "pre-qualified," "approved," "pre-approved," or "green lighted," to receive a loan modification. In many cases, the HOPE telemarketer then gave the homeowner an "approval code," "pre-approval code," "file number," or "case number."

26.     In fact, as the defendants knew, HOPE had no "underwriters" and could not determine whether the homeowner's lender would agree to modify the loan.

### Specified Reduction in Mortgage Payment

27.     In many cases, HOPE telemarketers told homeowners that their monthly mortgage payment would be reduced by a specified amount or within a specified range, typically several hundred dollars. In other cases, the HOPE telemarketers told homeowners that their interest rate would reduced by a specified amount or to a specified range, typically to between 2% and 4.5%.

28.     In fact, the defendants knew that, even assuming the homeowner was going to receive a loan modification, HOPE had no way to determine what the new interest rate or monthly payment amount would be – only the lender could determine this.

### HOPE's Near-Perfect Track Record

29.     HOPE telemarketers told homeowners that the company had an approximately 98% success rate in obtaining loan modifications for its customers. The telemarketers often added that the "only way" the homeowner would not receive a loan modification was if he or she lied when providing financial information on the loan modification application.

30.     In fact, it is difficult for homeowners to qualify for loan modifications under the HAMP program, and only approximately 25% of applicants nationwide receive modifications. Furthermore, the vast majority of HOPE's customers who applied for loan modifications had their applications denied.

### Homeowners Would Not Receive Modifications Without HOPE

31.     HOPE's telemarketers told homeowners that, in exchange for paying the up-front fees, they would receive valuable assistance in obtaining a loan modification and added that, without HOPE's help, the homeowners would likely be unsuccessful. The telemarketers often explained that HOPE was able to be so helpful because it used its connections with mortgage lenders on behalf of its customers.

32.     In fact, HOPE did not negotiate with mortgage lenders on behalf of homeowners, and, because HOPE did not have a license to do this, it was prohibited by Florida law from doing so.

33.     Furthermore, the HAMP application form that HOPE mailed to its customers was virtually identical to the government forms that homeowners could obtain free of charge. In some cases, HOPE telemarketers also provided customers with what they described as "software" – this was, in fact, log-in credentials that provided one-time, temporary access to one of HOPE's websites. These websites contained an electronic version of the same HAMP application that HOPE mailed to the customers.

9

34.    The so-called "software" did not allow HOPE's customers to save, print, or download the application.  Rather, they could input information and send the form electronically back to HOPE.  HOPE employees would then print out the application, mail it to the homeowner, and instruct the homeowner to submit it to his or her lender.

### Homeowners Could Stop Mortgage Payments

35.    In an effort to persuade homeowners that they could afford the $400-$900 up-front fee, HOPE telemarketers told potential customers that they could stop making their mortgage payments during the several months that it would take HOPE to arrange for their loan modification.

36.    In fact, HOPE did nothing that would have excused homeowners from making mortgage payments.  When some HOPE customers followed HOPE's direction and stopped paying their mortgages, they risked foreclosure.

### HOPE Operated as a Non-Profit

37.    In an effort to portray HOPE as a legitimate entity whose goal was to help struggling homeowners, HOPE telemarketers repeatedly told potential customers that HOPE was a "non-profit."

38.    In fact, HOPE had obtained its Florida non-profit status by fraudulently misrepresenting its corporate purpose as, "Provide Consumers Education for purpose of managing personal debt."

39.    Furthermore, HOPE did not operate as a legitimate non-profit entity.  The IRS recognized this and rejected HOPE's application for federal non-profit status.  The IRS provided HOPE with a detailed analysis to support its conclusion that HOPE operated as a commercial entity.

GODFREY and FISCHER used a substantial amount of money from HOPE's business accounts for personal expenses, including restaurant dining, fitness club memberships, department store purchases, international travel, liquor store purchases, and swimming pool maintenance.

### Money-Back Guarantee

40.     HOPE telemarketers told homeowners that HOPE would refund the up-front fee in the unlikely event that the home loan modification was not approved.

41.     But when customers asked for refunds after their loan modification applications had been declined, HOPE refused.  When the customers then attempted to reverse the charges (through a mechanism called a "charge-back"), HOPE challenged the charge-backs, often relying on language on the company's website stating that the company had a "no refund" policy or would not give refunds after 72 hours.

42.     Ultimately, HOPE discouraged its telemarketers from accepting credit card payments and asked them to request that customers pay by bank transfer, because the bank transfers were harder for the customers to reverse later.

### Misuse of a Government Seal

43.     The HAMP loan modification application that HOPE sent to its customers displayed the seal of the United States Department of the Treasury. However, in an effort to ensure that homeowners agreed to pay HOPE's fees and did not discover that they could receive free assistance with their loan modification application, GODFREY and FISCHER replaced the words "Homeowners' HOPE Hotline," and the toll-free government-sponsored phone number, which appeared on the legitimate HAMP application, with the words "Homeowner Protection Economics" and HOPE's telephone number.

11

## OVERT ACTS

**Setting up HOPE**

44.     On or about April 9, 2009, GODFREY and FISCHER opened a checking account in the name of "Home Owner Protection Economics, Inc." at JP Morgan Chase Bank.   Both GODFREY and FISCHER were signatories on that account.

45.     In approximately April 2009, GODFREY submitted an application to the IRS to obtain non-profit status for HOPE. In that application, he stated that HOPE's purpose was "charitable" and "educational," that it would be undertaking "fundraising," and that it would be "making grants, loans, and other distributions to organizations."

46.     The IRS rejected this application. In its rejection letter, the IRS noted that: HOPE was not operated exclusively for an exempt purpose (e.g., educational or charitable purpose) but rather had a "substantial nonexempt commercial purpose"; its operations did not serve a public interest; its revenue consisted of service fees and not "fundraising" or "grants"; and it was operated for the benefit of its directors.

47.     On or about December 31, 2009, GODFREY submitted an application to amend HOPE's Articles of Incorporation to change its purpose from "Any Lawful Purpose" to "Sale of Software Product."

48.     On or about January 29, 2010, after the State of Florida sent GODFREY a letter with the notation, "sale of software is non-profit????," GODFREY re-submitted the same application, but he crossed out the words "Sale of Software Product" and handwrote "Provide Consumers Education for purpose of managing personal debt." Florida granted HOPE non-profit status.

**HOPE Customers**

*Customer Sara F.*

49.    In approximately July 2010, HOPE sent a mailer to Massachusetts resident Sara F., advertising its loan modification services. She called the phone number on the mailer and spoke to a HOPE telemarketer with the initials B.H., who told her that her home loan modification was approved. B.H. provided Sara F. with a "pre-approval code," and he told her he could reduce her interest rate from 6.3% to 4.25%. Sara F. then agreed to pay HOPE a $595 fee.

50.    In approximately July 2010, HOPE sent Sara F. a package containing a HAMP loan modification application. After she filled out the application, submitted it to her lender, and was rejected, she called HOPE to seek a refund. HOPE denied her refund request, with a HOPE employee telling her that she had paid for a software licensing fee that was non-refundable.

*Customer Jesse M.*

51.    In approximately August 2010, HOPE sent a mailer to Massachusetts resident Jesse M. In approximately September 2010, he called the phone number on the mailer and spoke to a HOPE telemarketer with the initials S.S., who told him that he was guaranteed to receive a loan modification, that his interest rate would be reduced to 3.1%, and that his monthly mortgage payment would be reduced to $987. S.S. also told Jesse M. that HOPE was a non-profit company that was part of the government's loan modification program. S.S. added that Jesse M. could stop making his mortgage payments until all of the modification paperwork was complete. Jesse M. then agreed to pay HOPE a $795 fee and skipped his next two mortgage payments.

52.    In approximately August 2010, HOPE sent Jesse M. a package containing the same HAMP application that he had already submitted on his own to his lender. When he explained this to a HOPE employee, the employee told him to nonetheless send the application to his lender. After

13

Jesse M. filled out the application, submitted it to his lender, and was rejected, he called HOPE to seek a refund. HOPE denied his refund request, telling him that he had paid a "software fee."

### Customer Michelle M.

53.     In approximately August 2010, HOPE sent a mailer to Massachusetts resident Michelle M. She called the phone number on the mailer and spoke to a HOPE telemarketer with the initials F.S., who told her that she was qualified for a loan modification. F.S. provided Michelle M. with an "approval code" and a "case number" and told her that her new mortgage payment would be $992 with a fixed 4.25% interest rate, effective October 1, 2010. F.S. also told Michelle M. that she did not have to make her September mortgage payment. In response, Michelle M. paid HOPE's $795 fee.

54.     In approximately August 2010, HOPE sent a package to Michelle M. containing a HAMP application. After she filled out the application, submitted it to her lender, and was rejected, she called HOPE to seek a refund. HOPE denied her refund request. When Michelle M. asked her credit card company to reverse the $795 charge, HOPE successfully disputed her request, claiming that she had purchased a "software license."

### Customer Synya G.

55.     In approximately August 2010, HOPE sent a mailer to Massachusetts resident Synya G. She called the phone number on the mailer and spoke to KELLY, who told her that she qualified for a loan modification and that HOPE would be able to cut her mortgage payment in half. He gave her a new loan number and told her not to pay her current mortgage because HOPE would put the past due amount into the new mortgage. In response, Synya G. paid $695 to HOPE with a credit card.

56.     In approximately August 2010, HOPE sent Synya G. a package containing the

14

HAMP application, which she submitted to her lender. When she received a rejection letter back from her lender, she called KELLY, who told her that she should apply again and that she would not receive a refund from HOPE unless she had been rejected three times.

57.     Synya G. then applied two more times, using the form from HOPE, and was rejected each time. After the third rejection, she called KELLY several times. Each time, he told her that HOPE was processing her refund. She also spoke to BURRIS, who told her the same thing. Nonetheless, Synya G. never received a refund.

> Customer Anthony P.

58.     In approximately October 2010, HOPE sent a mailer to Massachusetts resident Anthony P. He called the phone number on the mailer and spoke to KELLY, who said that he was working with Anthony P.'s mortgage lender. KELLY said that Anthony P. qualified for a loan modification and that HOPE would be able to reduce his current mortgage payment from approximately $1,700 to $1297. KELLY also gave Anthony P. a new loan number. But when KELLY added that the program cost $795, Anthony P. said that he could not afford the fee and ended the call.

59.     A short time later, KELLY called Anthony P.'s cell phone, saying that he had spoken to a supervisor who had authorized him to lower the price to $595. Anthony P. responded that he would have to speak to his wife about this. KELLY then called Anthony P.'s wife and persuaded her that HOPE was legitimate. Ultimately, Anthony P. paid the $595 with a credit card. KELLY then advised him to stop making his mortgage payment because "it makes it look good." Anthony P. followed this advice.

60.     When Anthony P. received a package from HOPE containing the loan modification application, he was surprised, because he had been led to believe that the process had already been

15

completed. Nonetheless, Anthony P. submitted the application to his lender, who denied the modification request. Anthony P. then repeatedly called HOPE, asking for an explanation and a refund, but he received neither.

### Customer Kari F.

61.     In approximately November 2010, HOPE sent a mailer to Massachusetts resident Kari F., who called HOPE in response to the mailer. She spoke to KELLY, who told her that she qualified for a loan modification, which he described as a "sure thing." He added that the new interest rate would be 2%, with a monthly mortgage payment of $975. KELLY told Kari F. that HOPE would be the mediator between her and her lender in the modification process. Kari F. then paid a $795 fee and entered her financial information into the application form on the HOPE website.

62.     Shortly thereafter, Kari F. received a package in the mail from HOPE containing her HAMP application along with directions instructing her to submit it to her lender. The package also contained a hardship letter that significantly overstated Kari F.'s financial hardship. Because she was concerned about the inaccuracies in HOPE's hardship letter and because the loan modification had suddenly become a do-it-yourself process, Kari F. decided not to submit the application to her lender.

### Customer Patrick J.

63.     In approximately November 2010, a HOPE telemarketer with the initials A.M. called Massachusetts resident Patrick J. A.M. told Patrick J. that he was "99.9%" guaranteed to receive a home loan modification, that he would receive a full refund if not satisfied, and that he should stop making his mortgage payments. Patrick J. agreed to pay HOPE $795.

64.     In approximately December 2010, HOPE sent a package to Patrick J. containing a HAMP application. After he filled out the application, submitted it to his lender, and was rejected,

he called HOPE to seek a refund. HOPE denied his refund request because, a HOPE employee told him, he had missed the 10-day refund deadline. When he called again, another HOPE employee told him that he had to be denied a modification three times before he could receive a refund. Patrick J. never received a refund from HOPE.

### Customer Stephen W.

65.    In approximately January 2011, a HOPE telemarketer with the initials M.J. called Massachusetts resident Stephen W., who told M.J. that he had already applied, unsuccessfully, for a loan modification at least 12 times. M.J. nonetheless told Stephen W. that he was qualified to receive a modification, that he would receive a new interest rate of 4% for a 40-year loan, and that HOPE had a team of lawyers who would work closely with his lender to ensure his loan modification.

66.    M.J. also told Stephen W. that he should not pay his mortgage for the next two months, to help himself qualify for a modification. M.J. added that, if Stephen W. was not satisfied with HOPE's services, he could obtain a refund by disputing the credit card charge for HOPE's fee. In response, Stephen W. agreed to pay HOPE's $895 fee.

67.    In approximately January 2011, HOPE sent a package to Stephen W. containing the same HAMP application that Stephen W. had submitted to his lender 12 times before. Stephen W. filled out the application once more, submitted it to his lender, and was again rejected.

68.    Stephen W. then called HOPE to seek help with his mortgage, as he was now two months behind on his payments. M.J. told Stephen W. to contact his own attorney because there was nothing HOPE could do for him. When Stephen W. asked his credit card company to reverse the charge for HOPE's fee, HOPE disputed this charge-back, and the fee remained on Stephen W.'s credit card bill.

17

*Customer Lou Ellen K.*

69.     In approximately February 2011, Massachusetts resident Lou Ellen K. received a mailer from HOPE. She called the phone number on the mailer and was connected to KELLY, who told her that HOPE worked with the government and the customer's lender to modify mortgages. KELLY told her that she qualified for the program, that he could guarantee her a 2% interest rate, and that her monthly mortgage payment would go from $986 to $547. KELLY also instructed her to stop paying her mortgage for three months, noting that the delinquent amount would be added to her new mortgage, which would begin on July 1, 2011. In response, Lou Ellen K. gave KELLY her checking account number, and HOPE processed a $895 payment from her account. She also stopped making her mortgage payments, as KELLY had instructed.

70.     Lou Ellen K. then received a package in the mail from HOPE containing her HAMP application, and she followed HOPE's instructions on how to submit the paperwork to her lender. When she had not heard anything for two months, she called her lender, who told her that it had not received her application and that, if she did not make a mortgage payment immediately, her mortgage would go into foreclosure status. When she attempted to contact KELLY by phone and e-mail to ask what had happened, she was unable to reach him.

All in violation of 18 U.S.C. §371.

## COUNTS TWO THROUGH TEN
### (Wire Fraud)
### 18 U.S.C. §§1343, 2

71.     The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 11-70 of this Indictment and further charges that:

On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendants,

(1) CHRISTOPHER S. GODFREY,
(2) DENNIS FISCHER,
(3) VERNELL BURRIS, JR. and
(4) BRIAN M. KELLY,

having devised a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted in interstate commerce, wire communications, including writings, signals, and sounds, for the purpose of executing the scheme to defraud, as set forth below:

| Count | Date | Wire Transmission | |
|-------|------|-------------------|--|
| 2 | July 2010 | Phone call between Massachusetts resident Sara F. and HOPE telemarketer B.H. in Florida | |
| 3 | September 2010 | Phone call between Massachusetts resident Jesse M. and HOPE telemarketer S.S. in Florida | |
| 4 | August 2010 | Phone call between Massachusetts resident Michelle M. and HOPE telemarketer F.S. in Florida | |
| 5 | August 2010 | Phone call between Massachusetts resident Synya G. and KELLY in Florida | |
| 6 | October 2010 | Phone call between Massachusetts resident Anthony P. and KELLY in Florida | |

| 7 | November 2010 | Phone call between Massachusetts resident Kari F. and KELLY in Florida |
| 8 | November 2010 | Phone call between Massachusetts resident Patrick J. and HOPE telemarketer A.M. in Florida |
| 9 | January 2011 | Phone call between Massachusetts resident Stephen W. and HOPE telemarketer M.J. in Florida |
| 10 | February 2011 | Phone call between Massachusetts resident Lou Ellen K. and KELLY in Florida |

All in violation of 18 U.S.C. §§1343 and 2.

## COUNTS ELEVEN THROUGH NINETEEN
### (Mail Fraud)
### 18 U.S.C. §§1341, 2

72.     The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 11-70 of this Indictment and further charges that:

On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendants,

### (1) CHRISTOPHER S. GODFREY,
### (2) DENNIS FISCHER,
### (3) VERNELL BURRIS, JR. and
### (4) BRIAN M. KELLY,

having devised, and intending to devise, a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, caused items to be delivered by U.S. mail and by private or commercial interstate carrier, for the purpose of executing the scheme, as set forth below:

| Count | Date | Mailing |
|-------|------|---------|
| 11 | July 2010 | HOPE direct mail solicitation to Massachusetts resident Sara F. |
| 12 | August 2010 | HOPE package containing a HAMP application to Massachusetts resident Jesse M. |
| 13 | August 2010 | HOPE direct mail solicitation to Massachusetts resident Michelle M. |
| 14 | August 2010 | HOPE package containing a HAMP application to Massachusetts resident Synya G. |
| 15 | October 2010 | HOPE package containing a HAMP application to Massachusetts resident Anthony P. |
| 16 | November 2010 | HOPE direct mail solicitation to Massachusetts resident Kari F. |

| | | |
|---|---|---|
| 17 | December 2010 | HOPE package containing a HAMP application to Massachusetts resident Patrick J. |
| 18 | January 2011 | HOPE package containing a HAMP application to Massachusetts resident Stephen W. |
| 19 | February 2011 | HOPE package containing a HAMP application to Massachusetts resident Lou Ellen K. |

All in violation of 18 U.S.C. §§1341 and 2.

## COUNT TWENTY
(Misuse of Government Seal)
18 U.S.C. §§1017, 2

73.     The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 11-70 of this Indictment and further charges that:

From approximately January 2009 through May 2011, in the District of Massachusetts and elsewhere, the defendants,

(1) CHRISTOPHER S. GODFREY and
(2) DENNIS FISCHER,

fraudulently and wrongfully affixed and impressed the seal of a department and agency of the United States, namely, the Department of the Treasury, to and upon a document – specifically, the HAMP application form – and with knowledge of its fraudulent character, and with wrongful and fraudulent intent, used and transferred to another such document, to which and upon which said seal had been so fraudulently affixed and impressed.

All in violation of 18 U.S.C. §§1017 and 2.

## FORFEITURE ALLEGATIONS
### Criminal Forfeiture
### (18 U.S.C. § 982)

The Grand Jury further alleges that:

74. Upon conviction of one or more of the offenses alleged in Counts One through Nineteen of this Indictment, the defendants,

> (1) CHRISTOPHER S. GODFREY,
> (2) DENNIS FISCHER,
> (3) VERNELL BURRIS, JR., and
> (4) BRIAN M. KELLY

shall forfeit to the United States (jointly and severally as to Count One), pursuant to 18 U.S.C. § 982(a)(8), any real or personal property used or intended to be used to commit, to facilitate, or to promote the commission of such offense; and any real or personal property constituting, derived from, or traceable to the gross proceeds that the defendants obtained directly or indirectly as a result of the offense.

75. If any of the forfeitable property, as described in the preceding paragraph, as a result of any act or omission of the defendants:

     a. cannot be located upon the exercise of due diligence;

     b. has been transferred or sold to, or deposited with, a third person;

     c. has been placed beyond the jurisdiction of the Court;

     d. has been substantially diminished in value; or

     e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendants up to the value of the property described in the preceding paragraph.

All pursuant to Title 18, United States Code, Section 982.

24

A TRUE BILL

_____
Foreperson of the Grand Jury

Adam J. Bookbinder
Assistant United States Attorney
Mona Sedky
Trial Attorney, U.S. Dept. of Justice, Criminal Division

DISTRICT OF MASSACHUSETTS                    August 3, 2011

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk        11:54AM

Case 1:11-cr-10279-RWZ *SEALED*   Document 2-1   Filed 08/03/11   Page 1 of 8

JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/2011)

**Criminal Case Cover Sheet**                                    **U.S. District Court - District of Massachusetts**

**Place of Offense:**                    Category No.   **II**              **Investigating Agency**   Treasury IG

**City**   Boston (and others)                    **Related Case Information:**

**County**   Suffolk (and others)
                                         Superseding Ind./ Inf. _____   Case No. _____
                                         Same Defendant _____   New Defendant _____
                                         Magistrate Judge Case Number _____
                                         Search Warrant Case Number   11-MJ-8218-JMH
                                         R 20/R 40 from District of _____

**Defendant Information:**

**Defendant Name**   Christopher S. Godfrey                    Juvenile:        ☐ Yes  ☑ No

**Alias Name**       Is this person an attorney and/or a member of any state/federal bar:   ☐ Yes  ☑ No

**Address**          (City & State)   Delray Beach, FL

**Birth date (Yr only):** 1969   **SSN (last4#):** 0961   **Sex** M   **Race:** Caucasian   **Nationality:** USA

**Defense Counsel if known:** _____                    **Address** _____

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA**   Adam Bookbinder                    Bar Number if applicable   566590

**Interpreter:**   ☐ Yes  ☑ No        List language and/or dialect: _____

**Victims:**   ☑ Yes  ☐ No   If yes, are there multiple crime victims under 18 USC§3771(d)(2)   ☑ Yes  ☐ No

**Matter to be SEALED:**   ☑ Yes  ☐ No

   ☑ Warrant Requested        ☐ Regular Process        ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____ on _____

**Charging Document:**   ☐ Complaint   ☐ Information   ☑ Indictment

**Total # of Counts:**   ☐ Petty _____   ☐ Misdemeanor _____   ☑ Felony   20

Continue on Page 2 for Entry of U.S.C. Citations

☑   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
    accurately set forth above.

Date: 8/3/11                    Signature of AUSA: _____

JS 45 (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk):

**Name of Defendant**   Christopher S. Godfrey

**U.S.C. Citations**

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 USC 371 | Conspiracy | 1 |
| Set 2 | 18 USC 1343 | Wire Fraud | 2-10 |
| Set 3 | 18 USC 1341 | Mail Fraud | 11-19 |
| Set 4 | 18 USC 1017 | Misuse of Government Seal | 20 |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**

cr js-45-MA2011.wpd - 3/25/2011

Case 1:11-cr-10279-RWZ *SEALED*   Document 2-1   Filed 08/03/11   Page 3 of 8

JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/2011)

**Criminal Case Cover Sheet**                                    **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** | **Category No.** II | **Investigating Agency** Treasury IG |
| **City** Boston (and others) | **Related Case Information:** | |
| **County** Suffolk (and others) | Superseding Ind./ Inf. _____ | Case No. _____ |
| | Same Defendant _____ | New Defendant _____ |
| | Magistrate Judge Case Number _____ | |
| | Search Warrant Case Number 11-MJ-8086-MBB | |
| | R 20/R 40 from District of _____ | |

**Defendant Information:**

| | | | |
|---|---|---|---|
| Defendant Name | Dennis Fischer | Juvenile: | ☐ Yes ☑ No |
| | Is this person an attorney and/or a member of any state/federal bar: | | ☐ Yes ☑ No |
| Alias Name | | | |
| Address | (City & State) Highland Beach, FL | | |
| Birth date (Yr only): 1971   SSN (last4#): 4278   Sex M   Race: Caucasian   Nationality: USA | | | |

Defense Counsel if known: _____                 Address _____

Bar Number _____

**U.S. Attorney Information:**

AUSA   Adam Bookbinder                 Bar Number if applicable   586590

| | | |
|---|---|---|
| Interpreter: | ☐ Yes ☑ No | List language and/or dialect: _____ |
| Victims: | ☑ Yes ☐ No   If yes, are there multiple crime victims under 18 USC§3771(d)(2) | ☑ Yes ☐ No |
| Matter to be SEALED: | ☑ Yes ☐ No | |

☑ Warrant Requested         ☐ Regular Process         ☐ In Custody

**Location Status:**

Arrest Date _____

☐ Already in Federal Custody as of _____ in _____.
☐ Already in State Custody at _____ ☐ Serving Sentence     ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____ on _____

| **Charging Document:** | ☐ Complaint | ☐ Information | ☑ Indictment |
|---|---|---|---|
| **Total # of Counts:** | ☐ Petty _____ | ☐ Misdemeanor _____ | ☑ Felony   20 |

Continue on Page 2 for Entry of U.S.C. Citations

☑   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

Date: 8/3/11                 Signature of AUSA: _____

JS 45 (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**     Dennis Fischer

**U.S.C. Citations**

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 USC 371 | Conspiracy | 1 |
| Set 2 | 18 USC 1343 | Wire Fraud | 2-10 |
| Set 3 | 18 USC 1341 | Mail Fraud | 11-19 |
| Set 4 | 18 USC 1017 | Misuse of Government Seal | 20 |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

_____

or js-45-MA2011.wpd - 3/25/2011

☜JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/2011)

__Criminal Case Cover Sheet__                                    __U.S. District Court - District of Massachusetts__

**Place of Offense:**                 Category No.   II               **Investigating Agency**  Treasury IG

City    Boston (and others)           **Related Case Information:**

County   Suffolk (and others)         Superseding Ind./ Inf. _____   Case No. _____
                                      Same Defendant _____   New Defendant _____
                                      Magistrate Judge Case Number _____
                                      Search Warrant Case Number    11-MJ-8081-MBB
                                      R 20/R 40 from District of  _____

**Defendant Information:**

Defendant Name   Vernell Burris, Jr. _____   Juvenile:        ☐ Yes  ☑ No

                 Is this person an attorney and/or a member of any state/federal bar:   ☐ Yes  ☑ No

Alias Name

Address          (City & State)  Boynton Beach, FL _____

Birth date (Yr only): 1959   SSN (last4#): 1602   Sex  M    Race: African American    Nationality: USA

**Defense Counsel if known:** _____   Address _____

**Bar Number** _____

**U.S. Attorney Information:**

AUSA    Adam Bookbinder _____   Bar Number if applicable    566590

**Interpreter:**    ☐ Yes  ☑ No      List language and/or dialect: _____

**Victims:**   ☑ Yes ☐ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)   ☑ Yes  ☐ No

**Matter to be SEALED:**   ☑ Yes   ☐ No

     ☑ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____   in _____
☐ Already in State Custody at _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____   on _____

**Charging Document:**     ☐ Complaint        ☐ Information        ☑ Indictment

**Total # of Counts:**     ☐ Petty _____   ☐ Misdemeanor _____   ☑ Felony   19

Continue on Page 2 for Entry of U.S.C. Citations

☑    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

Date: 8/3/11              Signature of AUSA: _____

Case 1:11-cr-10279-RWZ *SEALED*   Document 2-1   Filed 08/03/11   Page 6 of 8

JS 45 (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    Vernell Burris, Jr.

**U.S.C. Citations**

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 USC 371 | Conspiracy | 1 |
| Set 2 | 18 USC 1343 | Wire Fraud | 2-10 |
| Set 3 | 18 USC 1341 | Mail Fraud | 11-19 |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

cr js-45-MA2011.wpd - 3/25/2011

JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/2011)

## Criminal Case Cover Sheet                                    U.S. District Court - District of Massachusetts

**Place of Offense:**                       Category No. __II__        **Investigating Agency** __Treasury IG__

City __Boston (and others)__        **Related Case Information:**

County __Suffolk (and others)__     Superseding Ind./ Inf. _____        Case No. _____
                                    Same Defendant _____        New Defendant _____
                                    Magistrate Judge Case Number _____
                                    Search Warrant Case Number __11-MJ-2002-1000__
                                    R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __Brian M. Kelly__                        Juvenile:        ☐ Yes  ☑ No

                        Is this person an attorney and/or a member of any state/federal bar:   ☐ Yes  ☑ No

Alias Name _____

Address __(City & State) Boca Raton, FL__

Birth date (Yr only): __1976__  SSN (last 4#): __0690__  Sex __M__   Race: __Caucasian__   Nationality: __USA__

**Defense Counsel if known:** _____        Address _____

Bar Number _____

**U.S. Attorney Information:**

AUSA __Adam Bookbinder__                    Bar Number if applicable __566590__

Interpreter:   ☐ Yes  ☑ No        List language and/or dialect: _____

Victims:   ☑ Yes  ☐ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)   ☑ Yes  ☐ No

Matter to be SEALED:   ☑ Yes  ☐ No

   ☑ Warrant Requested        ☐ Regular Process        ☐ In Custody

Location Status:

Arrest Date _____

☐ Already in Federal Custody as of _____ in _____
☐ Already in State Custody at _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____ on _____

Charging Document:   ☐ Complaint   ☐ Information   ☑ Indictment

Total # of Counts:   ☐ Petty _____   ☐ Misdemeanor _____   ☑ Felony __19__

Continue on Page 2 for Entry of U.S.C. Citations

☑ I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

Date: __8/3/11__        Signature of AUSA: _____

JS 45 (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**   Brian M. Kelly

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 USC 371 | Conspiracy | 1 |
| Set 2 | 18 USC 1343 | Wire Fraud | 2-10 |
| Set 3 | 18 USC 1341 | Mail Fraud | 11-19 |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

cr js-45-MA2011.wpd - 3/25/2011